**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| J.K. | ) | |
| By His Parents and Next Friends, | ) | |
| PAUL and HEIDI KRAFT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:04-CV-293-TS |
| | ) | |
| METROPOLITAN SCHOOL DISTRICT | ) | |
| SOUTHWEST ALLEN COUNTY, | ) | |
| SMITH-GREEN-WEST ALLEN SPECIAL | ) | |
| EDUCATION COOPERATION SERVICES, | ) | |
| and SUELLEN REED, IN HER OFFICIAL | ) | |
| CAPACITY AS SUPERINTENDENT OF | ) | |
| PUBLIC INSTRUCTION, and THE INDIANA | ) | |
| DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

This matter comes before the Court by way of a Complaint for Declaratory Relief brought

by J.K., by his parents and next friends, Paul and Heidi Kraft, against the Metropolitan School

District of Southwest Allen County, the Smith-Green-West Allen Special Education Cooperation

Services, Suellen Reed, in her official capacity as Superintendent of Public Instruction, and the

Indiana Department of Education. The Plaintiffs allege that the Defendants violated J.K.'s rights,

under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq., and

corresponding state special education laws to a free appropriate public education (FAPE). The

Plaintiffs allege that the State educational agencies failed to provide a hearing process that complies

with the IDEA.

The Plaintiffs have presented their issues and claims to this Court in a motion for summary

judgment filed on December 8, 2004 [DE 18]. The "State Defendants," Suellen Reed and the Indiana Department of Education, responded and filed a cross motion for summary judgment on January 5, 2005 [DE 22]. The "School Defendants," the school district and the special education cooperative services, responded on February 25, 2005, and filed their own Motion for Summary Judgment on March 25, 2005 [DE 47]. The claims against the State Defendants were dismissed by the Court's May 24, 2005, Order. The claims and motions involving the Plaintiffs and the School Defendants are the subject of this Opinion and Order.

## PROCEDURAL BACKGROUND

On October 21, 2003, believing that the School was not providing J.K., an autistic child, with a FAPE, J.K.'s counsel requested a due process hearing with the Division of Exceptional Learners, Indiana Department of Education. The Indiana Department of Education appointed an Independent Hearing Officer (IHO), who conducted a hearing over the course of four days in late January and February 2004. The IHO issued his decision on March 5, 2004, finding, *inter alia*, that the school had denied J.K. a FAPE and ordering relief for J.K. and his parents. The School Defendants, dissatisfied with the IHO's decision, appealed to the Board of Special Education Appeals (BSEA). The BSEA reviewed the IHO's findings and issued a decision on July 6, 2004, amending many of the IHO's findings of fact and conclusions of law and deleting the IHO's orders.

On August 3, 2004, the Plaintiffs appealed the BSEA's decision by filing their Complaint in this Court. The Plaintiffs seek declaratory relief, reinstatement of the IHO's decision, and attorney's fees, costs, and expert witness fees. On October 1, 2004, the State Defendants filed an Answer. On October 1, 2004, the School Defendants filed an Answer.

On December 7, 2004, the Plaintiffs moved for summary judgment against all the Defendants. On January 5, 2005, the State Defendants responded and filed a cross motion for summary judgment. On January 19, the Plaintiffs filed their brief opposing the State Defendants' Motion for Summary Judgment, to which the State Defendants replied on January 27, 2005. On March 1, 2005, the Plaintiffs filed an additional brief opposing the State Defendants' Motion for Summary Judgment.

On February 25, 2005, the School Defendants responded to the Plaintiffs' Motion for Summary Judgment. On March 10, 2005, the Plaintiffs replied. On March 25, the School Defendants filed their own Motion for Summary Judgment. The Plaintiffs responded on April 25. On May 10 the School Defendants replied.

On May 24, the Court granted the State Defendants' Motion for Summary Judgment and dismissed the Plaintiffs' claims against the State Defendants.

## STANDARD OF REVIEW UNDER THE IDEA

"Any party aggrieved by the findings and decision" of a hearing officer or state agency "shall have the right to bring a civil action with respect to the complaint . . .  in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). In any action brought in a federal court under § 1415(i), the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and shall, basing its decision on the preponderance of the evidence, grant such relief it determines is appropriate. 20 U.S.C. § 1415(i)(2)(B). Because of the unique procedural posture of cases under the IDEA in which a federal court is asked to review the decision of the state educational administrative body, summary

judgment has been deemed the appropriate mechanism for bringing the issues and claims before the court for decision. *Beth B. v. Van Clay*, 282 F.3d 493, 496 n.2 (7th Cir. 2002).

When neither party has requested that the district court hear additional evidence, "there is nothing new presented to the district court; thus '[t]he motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.'" *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997) (quoting *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994)). The Seventh Circuit has indicated that a decision by a district court in such circumstances might well be described as judgment on the record. *Beth B.*, 282 F.3d at 496 n.2. Accordingly, despite being termed summary judgment, the district court's decision is based on the preponderance of the evidence. *See Bd. of Educ. of LaGrange Sch. Dist. No. 105 v. Ill. State Bd. of Educ.*, 184 F.3d 912, 915 (7th Cir. 1999).

However, a district court must confer "due weight" to the final decisions of the state administrators and may not substitute its own notions of sound educational policy for those of the school authorities. *Butler v. Evans*, 225 F.3d 887, 892 (7th Cir. 2000) (citing cases).

> [A] district court must independently determine whether the requirements of the Act have been satisfied. In developing this standard, Congress specifically rejected language which would have made state administrative findings conclusive if supported by substantial evidence. However, because courts do not have special expertise in the area of educational policy, they must give "due weight" to the results of the administrative decisions and should not substitute "their own notions of sound educational policy for those of the school authorities which they review."

*Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Ill. Bd. of Educ.*, 41 F.3d 1162, 1166 (7th Cir. 1994) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)); *see also Heather S.*, 125 F.3d at 1052–53.

The "due weight" that a court must give to the hearings below is not to the testimony of

witnesses or to the evidence—both of which must be independently evaluated—but to the decisions of the hearing officers. *Heather S.*, 125 F.3d at 1053. Where no evidence is put forth beyond what was presented to the administrative judges, the court must provide "the usual deference that reviewing courts owe agencies when judicial review is limited to the administrative record." *Sch. Dist. of Wis. Dells v. Z.S.*, 295 F.3d 671, 675 (7th Cir. 2002). Where there are conflicting decisions on an issue between the two levels of a state administrative review, federal courts are required to defer to the final decision of the state authorities, *LaGrange Sch. Dist. No. 105*, 184 F.3d at 915, in this case, the BSEA.

Finally, the party challenging the decision or findings of the state educational agency bears the burden of proof. *LaGrange Sch. Dist. No. 105*, 184 F.3d at 915; *see also Bd. of Educ. of Cmty. Consol. Sch. Dist. 21 v. Ill. State Bd. of Educ.*, 938 F.2d 712, 716 (7th Cir. 1991).

## OVERVIEW OF THE IDEA

To better understand the facts of this case and their significance to the issues presented to this Court for review the Court will begin with a basic overview of the IDEA's purposes and requirements.

### A. Free Appropriate Education (FAPE) and Individualized Education Plan (IEP)

To meet the IDEA's requirements, a school district must provide each disabled student with a free appropriate public education tailored to the child's individual needs. *See* 20 U.S.C. §§ 1400(d)(1)(A) and 1412(a)(1)(A). A FAPE is an education "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to

benefit' from the instruction." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188–89 (1982). The school district, however, is not required to provide the best possible education. *See Heather S.*, 125 F.3d at 1057.

A particular child's FAPE is defined by the Individualized Education Plan (IEP), which is a written statement that maps out how a school district will provide an IDEA-compliant education. *Alex R. v. Forrestville Valley Cmty. Unit Sch. Dist. #221*, 375 F.3d 603, 606 (7th Cir. 2004). The IEP is developed through a case conference process with the input of parents and educators. 20 U.S.C. §§ 1401(11) and 1414(d); *Roy v. Valparaiso Cmty. Sch.*, 951 F. Supp. 1370, 1373 (N.D. Ind. 1997). The IEP must be tailored to the unique needs of the disabled student. 20 U.S.C. § 1414(d).

**B. Due Process**

The IDEA establishes a system of procedural protections to ensure that parents, teachers, and local education agencies work together to provide an appropriate education for children with disabilities. *Powers v. Ind. Dept. of Educ., Div. of Special Educ.*, 61 F.3d 552, 553 (7th Cir. 1995). Among the procedural safeguards provided in the IDEA are the right of the parents to written notice whenever a local, intermediate, or state educational agency proposes or refuses to propose a change in the child's educational plan, including any change in placement, and the right to present a complaint regarding a child's educational plan. 20 U.S.C. § 1415(b).

Section 1415 also provides for a hearing process to challenge the adequacy of the IEP when informal procedures have failed. Whenever a complaint has been received pursuant to § 1415, the complaining parent has an opportunity for an "impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate

6

educational unit, as determined by State law or the State educational agency." 20 U.S.C. § 1415(f)(1). Any party aggrieved by the findings and decision of a local educational agency may appeal to the State educational agency. 20 U.S.C. § 1415(g). In Indiana, that State agency is the BSEA.

## C. Analysis of a FAPE

The analysis of whether a FAPE has been provided as required under the IDEA is twofold: (1) has the state has complied with the IDEA's administrative procedures? and (2) is the IEP reasonably calculated to provide some educational benefit to the child? *See Rowley*, 458 U.S. at 206–07. Under the first prong, a denial of procedural rights does not automatically violate the IDEA's requirements for a FAPE. Instead, for such a violation to occur, the denial must adversely impact the parent's participation or the student's education so as to result in a loss of educational opportunity. Under the second prong, an IEP is adequate so long as it responds to all significant facets of the student's disability, both academic and behavioral. *Alex R.*, 375 F.3d at 613.

## ISSUES PRESENTED FOR REVIEW

In their Complaint, the Plaintiffs allege that the School violated the IDEA as follows:

(1)     The School failed to complete its evaluation of J.K., convene a case conference committee, and develop and implement an IEP before J.K's third birthday, in violation of 511 Ind. Admin. Code 7-28-2(e), which resulted in a gap in services.

(2)     The School failed to develop and implement a system to ensure that parents, teachers, staff, and administrators were adequately trained and licensed in the areas of the child's needs and

disabilities, in violation of 511 Ind. Admin. Code 7-21-2, 7-20-3, 7-28-1(h).[1]

(3)     The School failed to develop and implement an appropriate IEP that met the unique needs of J.K. as a child with Autism Spectrum Disorder (ASD).

(4)     The School failed to provide adequate recreational and physical therapy and rejected the parents proposals without offering an alternative, in violation of 511 Ind. Admin. Code 7-17-59 and 7-28.

(5)     The School failed to provide appropriate written notice to the parents in a reasonable period of time before refusing to include and provide certain services in J.K.'s education program as requested by the parents, in violation of 511 Ind. Admin. Code 7-22-2.

(Comp., ¶¶ 27(a)–(e).)

The parties present the following arguments in their briefs on the cross motions for summary judgment:

## A. IEP and Diagnosis of Autism Spectrum Disorder

The Plaintiffs complain that the School did not develop an IEP before J.K.'s third birthday. They assert that the IEP that was developed eleven days after J.K.'s third birthday should have been based on a classification of autism, not, as it was, on a classification of communication disorder. The Plaintiffs claim that the School delayed administering proper tests to diagnose J.K. with autism and delayed finding J.K. eligible for services based on autism.

The School argues, and the BSEA found, that the eleven-day delay in beginning services was minimal. The School also submits that J.K.'s IEP was initially developed using the evaluations that

---

[1] This issue has been abandoned as the Plaintiffs do not address it in any of their briefs.

were available to it at the time and there was not sufficient information to determine that J.K. was eligible for services based on autism—any such conclusion would have been premature. The School maintains that it complied with the law when it performed an evaluation for autism, and began providing services based on ASD, within sixty days of receiving a medical report that included a recommendation that J.K. be evaluated for autism.

**B. Home-Based Applied Behavioral Analysis**

The Plaintiffs contend that J.K.'s IEP should have included a home-based program under the methodology known as Applied Behavioral Analysis (ABA), and that the School was biased against this methodology.

The School submits that the record shows an honest disagreement regarding teaching methodology for autistic children, but that, under the IDEA, the parents were not entitled to a particular methodology. The issue, they assert, is not whether the School provided the programming specifically requested by the parents, but whether the programming the School provided was appropriate for J.K.

**C. J.K.'s Behavioral Problems**

A third point of contention between the parties is whether J.K. exhibited behavior that impeded his ability to learn such that the School should have conducted a functional behavioral assessment (FBA) and developed a behavioral intervention plan (BIP). The Plaintiffs believe that J.K.'s IEP was inadequate because it did not contain a BIP.

The School responds that it considered strategies to address J.K.'s behavior throughout the

IEP process, it was not obligated to perform an FBA or include a BIP in J.K.'s educational plan, and the behavior complained of did not occur in the educational setting, but at home.

## D. Occupational Therapy, Recreational Therapy, and Extended Hours

The Plaintiffs assert that the School deliberately delayed in providing occupational therapy (OT) to J.K., which resulted in a four-month gap in his OT services. Specifically, they argue that the School delayed in ordering the OT evaluation and improperly required the parents to obtain a physician's prescription for OT. They also contend that the School should have provided recreational therapy in addition to OT and accommodated the Plaintiffs' request to extend J.K.'s services beyond normal school hours because J.K. awoke during the night and needed to nap during the day.

The School submits that it met its requirement to complete an OT evaluation and convene a case conference committee within sixty instructional days of the date the parents gave permission for the evaluation, and actually began OT services within the sixty days. The School argues that requiring the parents to submit a physician's order to obtain the OT evaluation did not delay J.K.'s OT evaluation and did not result in the denial of a FAPE. The School contends that the Plaintiffs failed to show that J.K. required recreational therapy as part of an appropriate education and, thus, its failure to pay for tae kwon do instruction was not a violation of the IDEA. In any event, the School submits that it provided recreational therapy in the form of swimming lessons. The School maintains that, while it was its policy to limit services to school hours, it agreed to extend services to 4:00 p.m.

**E. Procedural Violations**

The Plaintiffs believe that the School's notices of case conference meetings were inadequate because they were not consistently in writing. The parents also claim that they were not always informed of the purpose of the meeting. In addition, the Plaintiffs challenge the School's failure to provide written notice of the reasons it rejected the parents' requests for ABA therapy, a behavioral plan, a behavioral assessment, behavioral goals, and recreational services.

The School maintains that the parents were informed of every meeting, although not always in writing, and that they participated fully in the process of developing J.K.'s IEP. They admit that not everything the parties discussed was reduced to writing, but deny that the parents were uninformed about the IEP and J.K.'s education.

## MATERIAL FACTS

**A. First Steps Program and Related Evaluations**

J.K. was born on December 29, 1999. Around October 2001, when J.K. was twenty-two months old, he began attending the First Step program because of developmental delays—J.K.'s mother was concerned about his speech. First Steps provides early intervention services to children with disabilities who are younger than three years old. In November, First Steps began giving J.K. speech therapy and, in January 2002, began developmental therapy. J.K. also received some occupational and physical therapy at First Steps. Lisa Petrass evaluated J.K. when he was two and found him to have significant expressive and language delay.

In May 2002, J.K. was administered the Rosetti Infant-Toddler Language Scale and was found to fall substantially below his age level across all expressive and language development

11

categories, especially language expression and comprehension. The developmental therapist at First Steps issued a report on J.K.'s progress on June 5, 2002, also indicating significant delays in the language-receptive category. She noted that J.K. could be physically aggressive "at times," but was starting to gain control of his "frustration tantrums."

In August 2002, when J.K. was two years, eight months old, Turnstone Center for Disabled Children and Adults conducted an evaluation and diagnosed him as having developmental delay. J.K. was reported to speak twelve words. The report indicated that J.K.'s mother said he banged his head a lot and had started pinching others.

**B. Transition to Pre-School; Development of IEP**

On November 19, 2002, the School, through its Early Childhood Coordinator (EC), Martha Barry, held a ninety-day transition meeting with J.K.'s mother.[2] The mother expressed concerns about J.K.'s language and behavior management and talked about him pinching and biting others. The First Steps information, including test results, were given to the EC at this meeting. J.K.'s parents were planning to take him for a developmental assessment at Riley Hospital within the next month. The School and the parents agreed to meet again on January 9, 2003, after the Riley evaluation was complete, to develop J.K.'s IEP.

On December 5, 2002, the School conducted a speech-language evaluation. Testing could not be completed because of J.K.'s lack of conditioning and response. The report recommended that an IEP be developed on January 9, 2003, when the parents could provide the results of the Riley

---

[2] Normally, the School, upon referral from First Steps, began the transition process ninety days before a child's third birthday so that an IEP could be in place when the child turned three. J.K.'s third birthday was on December 29, 2002.

evaluation, and that the IEP include speech therapy.

On December 17, 2002, a Discharge Report from Jump Start, Inc., where J.K. received services through First Steps, showed that J.K. demonstrated "progress with all his speech and language goals while being enrolled in the First Steps program." The report, prepared by Lisa Petrass,  recommended that J.K. continue to receive speech and language therapy to further assist his speech delay. A Transition Report prepared by the developmental therapist on December 19, 2002, stated that J.K. would benefit from being placed in a developmental preschool setting.

On December 19, 2002, Dr. Angela Tomlin at the Riley Hospital evaluated J.K.  Dr. Tomlin's report indicated that the evaluation was prompted by the parents' concerns about J.K.'s slow development of communication skills, hitting and pinching behaviors during play, disrupted sleep, and limited food preferences; additionally, she noted that the First Steps providers wondered if J.K. could have autism spectrum disorder. The evaluation included the doctor's review of records, parent interviews, observations of J.K., and formal testing.

Dr. Tomlin concluded that J.K. had behaviors that met the criteria for Pervasive Developmental Disorder, Not Otherwise Specified (PDDNOS). In the recommendations section of her report, Dr. Tomlin suggested that the Case Conference Committee (CCC)[3] consider J.K.'s eligibility for services for students with Autism Spectrum Disorder (ASD).

On December 29, 2002, over the winter break, J.K. turned three.

On January 9, 2003, the School and the parents participated in the first CCC meeting. J.K.'s mother gave the EC the recommendation portion of Dr. Tomlin's report. The CCC deemed J.K.

---

[3] An IEP is developed in Indiana through a case conference committee process. A CCC meeting consists of the case conference committee and the parent or guardian. The purpose of the meeting is to interpret data and results from educational evaluation tests of the child, to determine appropriate placement options for the child that provide the least restrictive environment for the child, and to determine necessary related services that the child is to receive.

eligible for services in the disability area of communication disorder. The IEP provided for speech therapy for thirty minutes twice a week to start January 9 and continue until June 3, 2003. The speech-language pathologist became the teacher of record (TOR). Notes from the CCC meeting indicate that the School would begin the process of involving the school psychiatrist to determine J.K. eligibility for services as a child with autism. The mother also requested ABA treatment and OT for J.K. The EC told J.K.'s mother that OT could not be a stand-alone service and that he would not receive OT unless he enrolled in the School's developmental preschool. She said this because the School did not provide OT services unless a student had an IEP for more than communication disorder and was receiving educational services from the School.[4]

The School conducted a psycho-educational evaluation on February 6, 2003, almost two months after J.K.'s third birthday. The Gillian Autism Rating Scale (GARS) and Childhood Autism Rating Scale (CARS) were not administered as part of this evaluation. These are rating scales completed by the parent to indicate autism. The psychologist's report, dated February 10, 2003, noted significant delays in social skills, expressive language, and language comprehension.

A second case conference was held on February 14, 2003. The parties discussed whether J.K. was eligible for services based on developmental delay or ASD. During the meeting, the School changed J.K.'s eligibility from communication disorder to "developmental delay with communication." This would allow the School to begin more intensive services. The parents thought J.K. should be classified as autistic. The School's autism consultant said she did not have sufficient information about J.K. to recommend classifying him as autistic. The School requested that the parents complete a GARS and CARS evaluation.

_____

[4] The School presumably did not consider speech therapy, by itself, to be an educational service.

During the February 14 meeting, the School recommended that J.K. undergo an OT evaluation, receive more speech therapy, and attend developmental preschool twice weekly. The committee also agreed that they would determine specific goals and objectives at the next conference, scheduled by agreement for March 11, 2003. The mother requested a one-to-one program of Applied Behavior Analysis (ABA) as a school-supported option. The autism consultant indicated that the School would not support a program that used ABA as the only teaching method.

On February 19, 2003, the parents wrote the EC expressing their concern over the diagnosis and their belief that J.K. should be diagnosed with ASD. They requested an intensive home-based program of ABA and increased speech therapy, to be implemented by March 1, 2003. They also requested that the School pay for services of an ABA consultant, thirty hours of weekly individual ABA therapy, and training for them and a therapist.

On February 21, 2003, the School provided the parents with the CARS and GARS assessment.

On February 25, 2003, the CCC convened. The School offered to provide services based on the diagnosis of developmental disability. The parents wanted to know if a diagnosis of autism was possible. The School participants indicated that an educational setting was needed to evaluate J.K.'s educational needs. The conference also discussed the need for an Assessment of Basic Language and Learning Skills (ABLLS) evaluation, to be completed by the parents and a teacher, and the CARS and GARS assessment, to be completed by the parents. The conference agreed that the parents would complete the evaluations and send them to the School and that J.K. would spend two weeks in a classroom to complete an educational evaluation. The parents were also asked to bring in a list of J.K.'s positive behaviors and to provide a prescription for OT services. During the meeting, J.K.'s

15

parents provided a list of behavior that they wanted to see extinguished, such as tantrums during hair washing, purposely spilling drinks, and walking on his toes.

The CCC met again on March 7, 2003. The case conference notes indicate that the parents wanted to use the ABLLS as the assessment tool for J.K. and that they had completed about 75% of the assessment. The parties agreed that the autism consultant, who was added as part of the program, would meet with the parents to complete the ABLLS and specify goals.

On March 13, 2003, the conference met with J.K.'s parents and determined that ASD, along with communication disorder, best described J.K.'s educational needs and changed his eligibility accordingly. The conference re-categorized the LRE from classroom to home-based program and changed his TOR to the School's autism consultant. They also added additional goals and objectives.

On March 20, 2003, J.K.'s physician ordered "physical therapy and/or Occupational Therapy." (R. at 679.)

The case conference met again on March 28, 2003. J.K.'s father expressed concern that the autism consultant did not have the expertise of an outside consultant. The parents also asked for services on weekends and holidays because J.K. awakened during the night and was tired during the day. The School explained its policy of limiting services to school hours. The School proposed providing J.K.'s services in the school building the next school year. The School was providing fifteen hours of at-home programming. The conference added eight hours of one-on-one instruction for J.K. to begin the week of April 8, 2003.

On April 10, 2003, the OT evaluation, which the School ordered on February 14, was conducted.

On April 22, 2003, the parents submitted a letter to the School proposing an IEP for J.K.

16

They requested the following: a home-based program using ABA as the teaching approach; financial support for thirty hours per week of one-on-one, home teaching therapy; financial support for an ABA consultant to oversee the home program; OT, if the results of an April 10, 2003, evaluation conclude that such therapy was needed; extended school year services throughout the summer of 2003, extending 8:00 a.m. to 3:00 p.m. service hours to 8:00 a.m. to 6:00 p.m.; training teacher therapist; and physical therapy in the form of swimming and tae kwon do.

On April 29, 2003, the conference met and agreed to the parent's request for more therapy and increased J.K.'s home program to thirty hours a week for the remainder of the school year. They also added weekly OT, agreed to extended school year services (ESY), including speech therapy and continuation of thirty hours of weekly home therapy. J.K.'s behavioral consultant presented the School with a list of behavioral goals and objectives that covered all developmental domains. These goals were not incorporated into the IEP Addendum. The School maintained that behavioral goals were part of the IEP because they were embedded in the ABLLS goals. The parties discussed the role of the autism consultant, the TOR, in the home-program and the parents disagreed with the School's selection.

Following the April 29 conference, the parties exchanged correspondence regarding the TOR and her qualifications to implement J.K.'s educational program. The parents wanted an ABA-trained professional to be the TOR. The parents also complained about behavioral goals that needed to be addressed and requested that a behavioral plan and behavioral goals be made a part of the IEP.

On May 13, 2003, OT services began.

The CCC met again on May 22, 2003. The committee discussed J.K.'s progress in occupational and speech therapy. The parents again requested evening and weekend services and

the School agreed to extend J.K.'s program from 3:30 p.m. to 4:00 p.m., but reiterated its policy against weekend services. The parents also expressed their desire to consult with a behavioral therapist. The CCC discussed ESY services and meeting weekly over the summer to discuss J.K.'s progress.

On September 5 and 10, 2003, the parties met to develop J.K.'s IEP for the 2003–2004 school year. J.K.'s mother presented the committee with a comprehensive set of goals and objectives for the 2003–2004 IEP. Most of these goals were measurable pursuant to the ABLLS. The School agreed on some of the behavioral goals, but no behavioral plan was incorporated into the IEP.

On September 19, 2003, the case conference met to discuss transitioning J.K.'s home-based therapy to in-school instruction over time, but did not make any changes to the IEP. The parents told the committee that J.K. was increasingly biting, screaming, and head banging. The parents objected to a transition from in-home therapy to in-school instruction and filed a request for a due process hearing on October 21, 2003.

During the pendency of the due process request, the case conference continued to meet and to communicate with the parents about J.K.'s IEP. They discussed the methodologies being used with J.K., such as ABA and verbal behavioral strategies, along with others. It was anticipated that J.K. would continue home-based instruction with a gradual integration into the intensive one-to-one preschool program that would be discussed the following semester. The School also indicated that it accepted the behavioral goals and objectives that the parents provided the School at the April 29 meeting. However, the School did not have a behavioral plan. The parents continued to discuss the behavior J.K. exhibited at home.

**C. Due Process Hearing**

After the Plaintiffs requested a due process hearing, the IHO appointed to the case identified

the issues in controversy as follows:

1.  The School's failure to complete its evaluation, convene a case conference committee, develop an individualized education program by the date of the child's third birthday, all in violation of 511 IAC 7-28-2(e). This delay resulted in the development of the child's IEP resulted in delays and gaps in services since [the child] left First Steps Program in December 2002.

2.  The School's failure to develop and implement a system to provide that parents, teachers, staff and administrators were adequately trained/licensed in the areas of the child's needs and disabilities, in violation of 511 IAC 7-21-2, 511 IAC 7-20-3 and 511 IAC 7-28-1(h).

3.  The School's failure to develop and implement an appropriate IEP taking into consideration the unique needs of [J.K.]. [J.K.] is a child with Autism Spectrum Disorder. The School has provided in the past and is currently providing an insufficient number of hours for Applied Behavioral Analysis Therapy (ABA). Further the School has denied extended hours of therapy, stating that it is its policy not to deliver these services outside the normal school day hours. This unbending policy fails to address the unique needs of the child with this disability. Because the School refused to support the appropriate number of hours to meet the educational needs of the child, the parents have been forced to incur the additional expense to support the appropriate level of therapy as well as the cost of an appropriate consultant. The School also refused to supply flashcards for the child that the Parents requested. The School also refused to provide necessary OT services for the child.

4.  The School's failure to provide an adequate level of recreational and physical therapy. Although the Parents proposed physical education in the form of swimming and tae kwon do to appropriately support the needs of the child, the School rejected this proposal and offered no alternative, in violation of 511 IAC 7-17-59 and 511 IAC 7-28.

5.  The School failed to comply with written notice requirements of 511 IAC Article 7 in that it failed to provide an appropriate written notice to the parents in a reasonable period of time prior to refusing to include and provide certain services in the child's education program as requested by the Parents in violation of 511 IAC 7-22-2.

19

6.      Whether the child is entitled to compensatory education.

7.      If procedural errors occurred and did they have an adverse effect on the child's education.

(R. at 26–27.)

The IHO conducted a hearing on January 28, 29, 30 and February 5, 2004. The hearing was closed to the public and both parties were represented by counsel. The IHO received exhibits and heard witness testimony.

On March 5, 2004, the IHO issued his decision. Of the seven identified issues for review, the IHO found the School in compliance in only one area: the School did develop and implement a system to provide that parents, teachers, staff, and administrators were adequately trained and licensed in the areas of the child's needs and disabilities. (R. at 3137.) As to the remaining issue, the IHO found that the School: failed to develop an IEP by J.K.'s third birthday, which resulted in delays and gaps in the child's services; failed to develop and implement an appropriate IEP that included a sufficient amount of ABA therapy, OT therapy, and extended hours of therapy outside the normal school day; failed to provide an appropriate level of recreation services; and failed to comply with the written notice requirements of Article 7. The IHO found that J.K. was entitled to compensatory education and that the School's procedural errors had an adverse effect on J.K.'s education.

As compensatory education, the IHO ordered J.K.'s then-existing home-based program to continue to be his FAPE in the LRE from March 5, 2004, to March 5, 2005. The School was ordered to support J.K.'s home-based program at forty hours per week, even if this resulted in providing services beyond the regular school day. The IHO also ordered the School to provide ESY services throughout the summer 2004, which would include the 40-hour home-based program, OT, and

swimming. The IHO ordered therapy for J.K. for 120 minutes each week and OT for 30 minutes each week, including during the summer. The remainder of the IHO's orders required the School to meet with the parents in December 2004 to develop an appropriate written transition plan to transition J.K. from home to school; to reimburse the parents for expenses they incurred for a behavioral consultant, parent training, parent counseling, and J.K.'s swimming lessons; and develop, within fifteen days, an IEP consistent with the IHO's order.

**D. BSEA Appeal**

The School appealed the IHO's determination to the BSEA, arguing that the IHO's decision was not supported by evidence in the record and was incorrect under the IDEA. The Plaintiffs responded that the IHO's decision should be upheld as supported by the evidence and in compliance with the law.

The BSEA reviewed the record, the requirements of state and federal law, the School's Petition for Review and the Plaintiff's Response, and issued it decision on July 6, 2004. The BSEA amended fifteen of the IHO's seventy-one findings of fact as unsupported by substantial evidence. The BSEA overturned the IHO's conclusions of law, except the conclusion in favor of the School regarding training, as not supported by the findings of fact and the record. The BSEA concluded that: although services did not begin on J.K.'s third birthday, any delay in beginning services was minimal; the IEP developed by the School was appropriate and there was no denial of a FAPE; there was no evidence that J.K. needed therapeutic recreational services; the School's failure to comply with written notice requirements were technical violations that did not result in harm to the child because the parents attended every meeting; J.K. was not entitled to compensatory education; and

the procedural errors committed by the School had no adverse effect on J.K.'s education.

The BSEA deleted the IHO's orders and ordered that the School's proposed IEP of September 5, 2003, be implemented. The student was to be transitioned from the home to the school during the first semester of the 2004–2005 school year with the IEP fully implemented within the school by the beginning of the second semester of that school year. The BSEA also ordered the School to meet with the parents in August, 2004, to develop an appropriate written transition plan to effectuate the transition to school for the 2004–2005 school year.


**DISCUSSION**

The School began evaluating J.K. shortly before his third birthday. Eleven days after J.K.'s third birthday, on January 9, 2003, the School categorized J.K. as eligible for services in the disability area of communication disorder. The IEP provided for speech therapy for thirty minutes twice a week. After it received a professional evaluation from Riley Hospital suggesting that J.K. may have ASD, the School began the process of evaluating whether J.K. was eligible for services as a child with autism. On February 14, the CCC changed J.K.'s designation to developmental delay with communication so that he could begin receiving more intensive services. Additional evaluations were completed and on March 13 the CCC changed J.K.'s eligibility category to include ASD and communication disorder. The least restrictive environment was changed from the classroom to the home. The School continued to meet with J.K.'s parents to discuss their proposals for J.K.'s IEP, including OT, recreational therapy, the ABA methodology, and extended hours. The issues concerning J.K.'s IEP are now before this Court.

As mentioned earlier, the Court's review is twofold. First, the Court must consider whether

the procedural requirements of the IDEA have been met. *Rowley*, 458 U.S. at 206. Second, the Court

determines whether the IEP is reasonably calculated to enable the student to receive educational

benefits. *Id*. at 206–07. The Plaintiffs challenge both the procedural and substantive adequacy of the

educational program implemented by the School Defendants for J.K. In presenting this challenge,

they bear the burden of proof. In addition, the Court must give due weight to the findings of the

BSEA.

**A. Claims Regarding Procedural Violations**

> The IHO found that

> [t]he School repeatedly failed to comply with written notice requirements of 511 IAC
> Article 7 in that it repeatedly failed to provide appropriate notice of case conference
> committee meetings and written notice to parents in a reasonable period of time prior
> to refusing to include and provide services in the child's education program as
> requested by the parents in violation of 511 IAC 7-22-2.

(IHO Conclusions, ¶ 5.) The IHO also concluded that the School's procedural errors "definitely had

an adverse effect on the child's education." (IHO, Conclusions, ¶ 7.)

> The BSEA found that the School, although it did not respond to all of the parents' requests

in writing, responded orally. The BSEA amended the IHO's findings to read as follows: "The School

repeatedly failed to comply with written notice requirements of Article 7 in that it repeatedly failed

to provide appropriate notice of case conference committee meetings. Although there were technical

violations, no harm resulted to the child as the parents attended every meeting." (BSEA, Findings

of Fact and Conclusions of Law, ¶ 23.) The BSEA also overruled the IHO finding that the

procedural errors had an adverse effect on J.K.'s education. (BSEA, Findings of Fact and

Conclusions of Law, ¶ 25) (finding that "[p]rocedural errors by the School had no adverse effect on

the Student's education").

Indiana administrative code requires the School to provide written notice to the parent a reasonable time before it:

> (1) proposes to initiate or change the identification, evaluation, or special education placement of the student or the provision of a free appropriate public education to the student; or
> (2) refuses to initiate or change the identification, evaluation, or special education placement of the student or the provision of a free appropriate public education to the student.

511 IAC 7-22-2(a).

Procedural flaws do not automatically require a finding of a denial of a FAPE. *Heather S.*, 125 F.3d at 1059. Only those procedural flaws that result in loss of educational opportunity can be held to deny a student a FAPE. *Id.*

The Plaintiffs have not established how the School's failure to provide all the required notices, in writing, adversely affected J.K.'s education and denied him a FAPE. They do not dispute that they attended every meeting with the School and were given an opportunity to present their recommendations and requests, or comment on the committee's recommendations. There is no objective evidence that J.K. suffered educational harm as a result of the School's procedural violations. Thus, the Court affirms the BSEA's determination that the School's notice violations were technical and did not result in harm to the Plaintiffs.

## B. Delay in Services, and Diagnosis of Autism Spectrum Disorder

For a student who may be eligible for early childhood special education, a school must complete an evaluation, convene a case conference committee to determine eligibility, develop an IEP, and implement it before the student's third birthday. 511 Ind. Admin. Code 7-28-2(e). The IHO

24

found that the School violated this section, which resulted in delays and gaps in J.K.'s services since he left the First Steps Program in December 2002. The BSEA found that services began on January 9, 2003, and that any delay in beginning services was minimal.

The Plaintiffs, however, point not only to the eleven day gap, but to the School's failure to designate J.K. as eligible for services as a child with autism before March 13, 2003, to argue that the delay was significantly longer than eleven days. The Plaintiffs maintain that the School was aware that J.K. could be autistic well before it classified him as such on March 13, 2003. As evidence of delay, the Plaintiffs point to the Riley Report recommendation provided on January 9, 2003, and the School's failure to administer the CARS or GARS assessments as part of the initial psychological evaluation on February 6.

The Court upholds the BSEA's finding that the School's failure to complete its evaluation of J.K. before his third birthday did not create a significant gap in services. Within eleven days of J.K.'s third birthday, which fell over the winter break, the School began providing services on the basis of evaluations available to it from Turnstone, Jump Start, and Possibilities Northeast, as well as its own December 5 evaluation.

In addition, the Court finds that the School acted reasonably and lawfully in its evaluation and categorization of J.K.  The School evaluated J.K. for autism, and began providing services based on ASD, within sixty instructional days of receiving the Riley report. The School received the Riley report on January 9, 2003. It conducted a psycho-educational evaluation on February 6, 2003. On February 14, the CCC changed J.K.'s designation to developmental delay and provided additional services. By February 21, the CARS and GARS assessments were provided to the parents. The School determined that an ABLLS evaluation was needed and took steps to have it completed.

During the March 13, case conference, the School changed J.K.'s eligibility to ASD.

The Indiana Administrative Code provides procedures for conducting the initial educational evaluation.

> Informed parental consent must be obtained prior to conducting an initial educational evaluation. A written request for an evaluation, signed by the parent and submitted to certified personnel, shall constitute written consent for an evaluation. . . . . The initial educational evaluation must be conducted and the case conference committee convened within sixty (60) instructional days of the date the written parental consent is received by certified personnel.

511 Ind. Admin. Code 7-25-4(b). The School notes that the Record is not clear as to when the School received parental consent to perform its own educational evaluation.[5] Nevertheless, the Record does show that the School completed the evaluation, held several case conferences, and began providing services based on ASD within fifty-three instructional days from January 9, 2003, the date the School received the Riley Report. The School argues that this was the first professional report suggesting that J.K. be evaluated for ASD. In the recommendation section of the Riley Report, the examining doctor "suggested that the Case Conference committee consider eligibility for services for students with Autism Spectrum Disorder." (R. at 623.)

In support of its decision to evaluate J.K. on its own so as to determine his educational needs, the School points to the administrative code:

> The determination of eligibility for special education and appropriate special education services and placement must be made on the basis of more than a single test or procedure or sole criterion. Specific information and procedures required to determine a disability and eligibility are described in 511 IAC 7-26. A comprehensive educational evaluation conducted by a team of qualified professionals shall include a variety of assessments and information gathering procedures designed to provide relevant functional and developmental information in all areas that may

---

[5] The Record before the Court includes a consent form signed by the parents on December 5, 2002. (R. at 635.) There is no evidence that certified School personnel received the consent on this date. In the Record, the consent form is grouped with other records dated January 9.

be related to the suspected disability, including, where appropriate, information on the student's: (1) health; (2) vision; (3) hearing; (4) social and emotional status; (5) general intelligence; (6) academic performance; (7) communication status; and (8) motor abilities.

511 Ind. Admin. Code 7-25-3(i).

Section 7-25-4(h) also addresses the need for an educational evaluation:

A comprehensive individual evaluation to determine the existence of a disability and the student's educational needs that fulfills the requirements of this rule and 511 IAC 7-26 shall precede any action with regard to the initial identification and provision of special education and related services. The educational evaluation of a student shall be conducted by a team of qualified professionals, including at least one (1) teacher licensed in, or other specialist with knowledge in, the area of suspected disability, and a school psychologist, except in the following situations:
(1) For a student with suspected communication disability only, such as a speech disorder, the speech-language pathologist may serve as the sole evaluator.
(2) For a student with a suspected learning disability, the evaluation team of qualified professionals shall also include the student's general education teacher, or if the student does not have a general education teacher, a general education teacher qualified to teach students of the same age.

511 Ind. Admin. Code 7-25-4(h). "For a student with a suspected developmental delay, the evaluation team shall include the parent and at least two (2) qualified professionals from different disciplines based upon the evaluation needs of the student." 511 Ind. Admin. Code 7-25-4(j). The administrative code also provides guidance for identifying a student with ASD specifically:

Identification as a student with autism spectrum disorder and eligibility for special education shall be determined by the case conference committee based on, but not limited to, the following information:
(1) An individualized standardized test of learning capability that, if necessary, includes a nonverbal psychological measurement.
(2) An assessment of educational need.
(3) An adaptive behavior evaluation.
(4) A communication evaluation by a speech-language pathologist assessing receptive, expressive, pragmatic, and social communication skills.
(5) A social and developmental history that includes family background information on communication, social interaction, play, sensory development, and physical milestones to assist in documenting the nature and extent of the student's learning difficulties and to help determine onset of the disability.

27

(6) Observation of the student across various environments.
(7) An evaluation of fine and gross motor skills and sensory processing abilities by trained personnel.
(8) A checklist of characteristics exhibited by students with autism spectrum disorder that matches criteria designated in the current edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders.

511 Ind. Admin. Code 7-26-2(c)(1)–(8).

First Steps providers' mention that J.K. might be autistic before the Riley evaluation does not demonstrate that the School violated the IDEA when it did not designate J.K. as autistic, and provide services based on such designation, until conducting an evaluation in response to the Riley Report. In response to a question whether she told J.K.'s mother, on November 19, 2002, that he looked autistic, Barry, the EC, testified that "[a]utism is not a diagnosis that we bandy about easily. That is something about which you don't make an opinion until you have a lot more information than I had." (R. at 1943.) This statement reflects a philosophy that is consistent with the evaluation and identification requirements set forth in the administrative code. The Plaintiff makes much of the School's failure to include the CARS and GARS assessments in their initial psycho-educational evaluation. However, this failure did not lead to an unlawful delay in providing services based on ASD because the School still complied with the sixty-day time period provided in the administrative code.

The BSEA was aware of the time line involved in this case from the initial IEP for speech therapy, the Riley Report, the School's evaluation, the request for the CARS and GARS assessment, the change in J.K.'s eligibility from communication disorder to developmental delay with communication, and the ASD designation. This Court's independent review of the record does not reveal that the facts regarding these events are in dispute. Accordingly, the Court must give due weight to the decision of the BSEA that the circumstances surrounding J.K.'s diagnosis and resulting

IEP did not violate the IDEA. The Court cannot say that it was unreasonable for the School to wait until it received the results of the upcoming Riley evaluation to slate its own evaluation. Nor was it improper for the School to conduct an independent evaluation to determine J.K.'s educational needs and not rely solely on the recommendation from a medical doctor that J.K. be considered eligible for services based on ASD.

The Court does not find that the School violated the IDEA when it did not designate J.K. as autistic before March 13, 2003. The School Defendants are entitled to summary judgment on the Plaintiffs' claim that the failure to designate J.K. as autistic before his third birthday violated the IDEA.

### C. Home-Based Applied Behavioral Analysis

The Plaintiffs claim that the IEP was defective because it did not incorporate the Plaintiffs' request for the ABA methodology. The School acknowledges that the Plaintiffs repeatedly requested home-based services using the ABA method and that the parties disagreed about the best methodology to use for J.K.'s home-based program. The IHO found that the School provided insufficient hours of ABA therapy. The BSEA held that this conclusion was not supported by the findings of fact and the record, and found that the School developed and implemented an appropriate IEP taking into account the needs of the student.

The Supreme Court has advised courts that they must be careful to avoid imposing their view of preferable educational methods upon state and local educational agencies, who have been given primary responsibility for formulating the education to be accorded a disabled child and for choosing the educational method most suitable to the child's need, in cooperation with the child's parents.

*Rowley*, 458 U.S. at 207. "Once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States." *Id.* at 208.

There has been a growing number of cases in which the central dispute is about the appropriate methodology for educating autistic children. *See J.P. ex rel. Popson v. West Clark Cmty. Schs.*, 230 F. Supp. 2d 910, 934 (S.D. Ind. 2002) (collecting cases). Here, the Court is guided by the following statement from the Seventh Circuit: "'Autism experts have a variety of opinions about which type of program is best. Federal courts must defer to the judgment of education experts who craft and review a child's IEP so long as the child receives some educational benefit and is educated alongside his non-disabled classmates to the maximum extent possible.'" *Sch. Dist. of Wisc. Dells v. Z.S. ex rel. Littlegeorge*, 295 F.3d 671, 676–77 (7th Cir. 2002) (quoting *Gill v. Columbia 93 Sch. Dist.*, 217 F.3d 1027, 1038 (8th Cir. 2000)).

In *Popson*, the court, faced with the plaintiff's argument that an intensive one-on-one, ABA/DTT[6] program was more effective than the "eclectic approach" offered by the school, noted that the law did not require the school to provide the student with the "better or best possible education." 230 F. Supp. 2d at 934. Rather, the school's duty is only to provide an education that is reasonably calculated to benefit the student. *Id.*; *see also Pitchford ex rel. M. v. Salem-Keizer Sch. Dist. No. 24J*, 155 F. Supp. 2d 1213, 1231 (D. Or. 2001) (stating that the issue on plaintiff's challenge to teaching method for autistic child was not whether other methods may have existed that were more effective than that chosen by the school, but whether the method chosen by the district was itself reasonably calculated to afford educational benefit).

Therefore, to persuade this Court to intervene and impose its own judgment on the matter, the [plaintiffs] will have to do more than merely show that the IEP they have

---

[6] DTT, or discrete trial training, is a subset under ABA.

> proposed would be better for [the student]; they must also show that the IEP proposed by [the school] was "inadequate," in the strict legal sense prescribed by the IDEA. [The plaintiff's] burden is made more difficult by the fact that the Court is also required by law to give "due weight" to the Hearing Officer's findings, especially where those finding entail an evaluation of education merits.

230 F. Supp. 2d at 934–35 (footnote omitted).

Here, the Plaintiffs face the same burden in challenging the School's IEP and the BSEA's decision that the IEP was appropriate and did not deny J.K. a FAPE. The Plaintiffs' claim that the School was "biased" against the ABA methodology and against home programs in general does nothing to meet this burden. The School began providing twelve weekly hours of in-home therapy on March 13, 2003, and increased the time to thirty hours by April 29. The program involved a group of methodologies (R. at 2311), none of which the Plaintiffs have attempted to prove was inadequate to confer some educational benefit to J.K. The School's expert testified she had not seen one methodology that addresses all the needs of a child with autism (R. at 3011) and that the home program provided by the School, which incorporated the ABLLS method along with other functional activities, was among the best she had ever seen (R. at 3014).

The Plaintiff has not established that the hours of, or the combination of methodologies used in, J.K.'s home-based program were not reasonably calculated to enable J.K. to receive educational benefits, or, in other words, that it is was unlikely to "produce progress," rather than "regression or trivial educational advancement." *See Alex R. v. Forrestville Valley Cmty. Unit Sch. Dist. #221*, 375 F.3d 603, 615 (7th Cir. 2004) (describing IEP that meets requirements of IDEA). The Court affirms the BSEA's determination regarding the adequacy of the IEP. J.K. was not denied a FAPE by the School's refusal to employ forty hours of the ABA methodology in J.K.'s home program.

**D. Functional Behavioral Assessment (FBA) and Behavioral Intervention Plan (BIP)**

The Plaintiffs contends that the School should have conducted a functional behavioral assessment and that the IEP did not meet J.K.'s unique needs for a behavioral intervention plan. The BSEA removed the following finding of fact contained in the IHO's decision: "The Student's behavior was affecting his ability to be educated." (R. at 3261.) The BSEA also changed other findings to clarify that J.K.'s behavioral problems were exhibited "at home." (R. at 3261–62.) The School contends that an FBA was not possible without first observing J.K. in an educational setting. However, the School maintains that the case conference committee consistently discussed and developed goals on the basis of the parents' observations of J.K.'s behaviors at home and a BIP was not necessary.

There are two situations where a BIP is possibly warranted. *Alex R.*, 375 F.3d at 614. Under § 1415(k), a duty arises to conduct an FBA and implement a BIP when the school imposes certain disciplinary sanctions on a disabled child. 20 U.S.C. 1415(k)(1). A BIP could also be warranted when a disabled student exhibits behavior that impedes the learning of himself or others. *Alex R.*, 375 F.3d at 614. Because the School did not impose disciplinary sanctions on J.K., only the second situation will be discussed.

The IDEA does not use the term "behavioral intervention plan" in § 1414(d)(3)(B)(i), but this section does require that a school district's IEP team, "in the case of a child whose behavior impedes the child's learning or that of others, *consider* the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i) (emphasis added); *Alex R.* at 614.

Here, J.K.'s potential interference with other students' learning is not at issue. His education

32

was strictly home-based. As to his own learning, the evidence does not suggest that the School ignored his behavioral issues and failed to consider strategies to address the behavior. For example, Jada Conner, the Assistant Director for Special Education for Smith-Green, testified that J.K.'s behavior was addressed through behavioral goals and objectives. (R. at 2460–61.) The Case Conference Agenda for April 29, 2003, listed ABLLS objectives and "Additional behavioral objectives" as two of five goal categories. (R. at 694.) The CCC notes from the April 29 meeting show that J.K's behavior was discussed. (R. at 697.) The EC testified that many of the April 29 goals and objectives referred to behaviors that would allow J.K. to access education. (R. at 1959.)

The Plaintiffs have not established that the School failed to consider the use of positive behavioral interventions and supports to address J.K.'s behavior. They gloss over the goals set forth in the IEP that relate to behavior and focus on the absence of a BIP. However, the mere absence of a BIP is not evidence that the CCC did not "consider" strategies to address J.K.'s behavior, which is all the statute requires. The IDEA does not set forth any substantive requirements for a BIP. *See Alex R.*, 375 F.3d at 615. There is ample evidence in the Record to suggest that the CCC considered J.K.'s behavioral issues and, in response, incorporated behavioral goals into his IEP. Moreover, the behaviors the parents identified were all behaviors exhibited in the home, not in the classroom. Whether the School would have been required to conduct an FBA and include a BIP in J.K.'s IEP if he was transitioned from a home-based program to the school setting is not at issue. The Court will not disturb the BSEA's conclusion that the IEP was appropriate, which necessarily implies that the IEP responded to all significant facets of J.K.'s disability, both academic and behavioral.

**E. Occupational Therapy, Recreational Therapy, and Extended Hours**

*1. Occupational and Recreational Therapy*

The Plaintiffs contend that OT services were unnecessarily delayed causing a four-month gap in such services. The Plaintiffs state that they requested an OT evaluation on November 19, 2002, December 5, 2002, and January 9, 2003, but the School did not order the evaluation until February 14, 2003. Then, contrary to law, the School required the parents to obtain a physician's prescription for OT, further delaying the process.

The School notes that the December 2002 Riley Report indicated that there was "disagreement about whether or not [J.K.] had sensory integration difficulties but apparently he has not been evaluated by a person with a specialty in this area." (R. at 619.) The School contends that the parents were not seeking OT. (R. at 665, Letter from Paul Kraft.) Later, in a letter dated April 22, 2003, the parents requested school-supported OT "if the results [of the evaluation] conclude [he] needs [it]." (R. at 690.) The School contends that it did not violate the law because it provided OT within sixty days of receiving the parents' permission for the evaluation.

The BSEA did not alter the IHO's finding that J.K.'s mother requested OT for J.K. on January 9, 2003, but added that the School recommended an OT evaluation on February 14, 2003, which was conducted on April 10, 2003. The BSEA also deleted the IHO's finding that "[t]he School did refuse to provide necessary OT services for the child." Instead, the BSEA found that the School developed and implemented an appropriate IEP and that there was no denial of a FAPE. (R. at 3262.) The BSEA did not make specific mention of OT in its finding regarding the IEP and a FAPE.

The Plaintiffs also contend that J.K. was entitled to therapeutic recreational services. The

34

BSEA found that there was "no evidence presented that the Student needed therapeutic recreational services," overruling the IHO's finding that the School failed to provide an appropriate level of recreation services. (R. at 3262.) The Plaintiffs, in response to the School Defendants' motion for summary judgment, "challenge the Defendants to point out what evidence in the record indicates that the child did not need physical or recreational therapy." (Pfs.'s Resp. at 6.) The Plaintiffs contends that the School never evaluated J.K. to determine his need in this area, despite the parents' request and despite the requirements of title 511, section 7-25-3(i) of the Indiana Administrative Code:

> A comprehensive educational evaluation conducted by a team of qualified professionals shall include a variety of assessments and information gathering procedures designed to provide relevant functional and developmental information *in all areas that may be related to the suspected disability*, including, where appropriate, information on the student's: (1) health; (2) vision; (3) hearing; (4) social and emotional status; (5) general intelligence; (6) academic performance; (7) communication status; and (8) *motor abilities*.

511 Ind. Admin. Code 7-25-3(i) (emphasis added).

Turning first to OT, there is no dispute that the School eventually provided OT to J.K or that OT is a "related service" that a school district may be obligated to provide to a student. *See* 20 U.S.C. § 1401(26)(A) (defining "related services" to include occupational therapy); 511 Ind. Admin Code 7-28-1(a)(5) (same). The question is whether the School waited too long to obtain the parents' permission, evaluate J.K., and provide OT. J.K.'s mother testified that she first requested OT in November. At the time, J.K. was only receiving speech therapy based on the designation of communication disorder. She was informed that OT was not a stand-alone service and J.K. needed to be receiving educational services (i.e., to be enrolled in the developmental preschool) before he could receive OT. Barry testified that the School typically did not provide OT to aid a child's

learning when they were not receiving educational services.

The School recommended an OT evaluation on February 14, 2003, obtained the parents' permission on March 7, conducted the evaluation on April 10, and began providing OT services on May 13. The School Defendants make much of the fact that they provided OT services within sixty days of receiving the parents' permission for the evaluation. Thus, the argument goes, the gap was not unlawful. This, however, ignores the Plaintiffs' argument that the School should have started the entire evaluation process earlier. The Court finds that the more appropriate inquiry is whether the School Defendants should have sought and obtained the parents' permission before March 7, either when J.K. began receiving speech therapy in January or some other date before March 7.

The Court does not agree with the Plaintiffs that the School should have known that J.K. needed OT services because he had received OT at First Steps. In the School's experience, First Steps sometimes provided services that were not necessary. The School acted appropriately in conducting its own evaluation to determine if OT services were necessary.

Nor is there any evidence in the Record to support the Plaintiffs' allegation that the School deliberately delayed the evaluation process. The School believed that OT services hinged on a certain designation or the receipt of services other than speech therapy. It is true that OT is not a stand alone service. *See* 511 Ind. Admin. Code 7-28-1 ("A student who may need a related service [such as OT] but does not need special education is not eligible for services under this article (511 IAC 7)."). However, "special education" may include "Speech-language pathology services." 511 Ind. Admin. Code 7-17-64(6). Accordingly, the School determined that J.K. was qualified for special education as early as January 9, 2003, and OT would not have been a stand alone service. If the School had authorized an OT evaluation and obtained the parent's permission at this time, it would

36

have had to provide OT sixty instructional days after January 9, on April 3, 2003. J.K. did not actually begin receiving OT until May 13. At most, based on these calculations, the Plaintiffs can argue that there was a five-week gap in OT services—not a four-month gap.

However, even this gap assumes that the School was obligated to evaluate J.K. for OT services merely because he qualified for special education. The law does not support such an assumption. Although the Court does not find the School's position, that it would have been providing OT as a stand-alone service, to be an accurate statement, neither does it find that the School was compelled to evaluate J.K. for OT services on the basis of his communication disorder designation.

The evaluation process set forth in the Indiana Administrative Code supports this conclusion. It requires that a "comprehensive educational evaluation" include a "variety of assessments and information gathering procedures designed to provide . . . information" in areas "*that may be related* to the suspected disability, including, *where appropriate*, information on the student's . . . motor abilities." 511 Ind. Admin. Code 7-25-3(I) (emphasis added). The phrases "may be related" and "where appropriate" provide the School with a certain amount of discretion to decide in which areas a student should be evaluated—based on his suspected disability. It is not mandatory that a school evaluate a student in all areas.

Here, with only a communication disorder designation and no psycho-educational evaluation, the Court cannot say that the School should have proceeded as if J.K.'s motor abilities were at issue. The parents provide no compelling reason why the School should have believed that motor abilities were related to J.K.'s designation and his receipt of speech therapy. They point only to their own requests for OT and to First Steps' provision of OT. It was not unreasonable for the School to decide

37

that J.K. did not need OT to learn and receive educational benefit from his speech therapy, the only service being provided at the time the parents requested OT. The Discharge Report from Jump Start recommended that J.K. "continue to receive speech and language therapy to further assist with his speech delay." (R. at 615.) It did not make any recommendation regarding OT or other services related to motor skills. Not until the School received further information about J.K.'s educational needs, based on its own evaluations, did it have reason to believe that OT services could help J.K. receive educational benefits. Even the February 6 evaluation did not suggest problems with motor abilities; it revealed significant delays in social skills, expressive language, and language comprehension.

The Court upholds the BSEA's decision to delete the IHO's finding that the School refused to provide necessary OT services for J.K. The Court also affirms the BSEA's finding that the School developed and implemented an appropriate IEP and that there was no denial of a FAPE, which necessarily implies that appropriateness of the School's actions regarding OT.

The Court also finds in favor of the School Defendants on the recreational therapy issue. Despite the lack of evidence in the Record that J.K. required such services, the School eventually paid for swimming classes for J.K. at the parents' request. The Plaintiffs have not established that the School's evaluations were inadequate to determine his need in this area. The occupational therapist who evaluated and worked with J.K., testified that she did not think that he needed physical therapy. (R. at 2762.) If she had observed such a need, she would have recommended a physical therapy evaluation. (*Id.*) The BSEA did not find that the School acted improperly in failing to pay for swimming lessons or tae kwon do. Neither does this Court.

### 2. Extended Hours

The Plaintiffs' challenge to the hours of service must be considered in the same way as the Plaintiffs' arguments regarding the ABA methodology. It is not enough for the Plaintiffs to assert that modifying the hours to include late afternoon or evening instruction would have been better. Rather, they must establish that the 8:00 a.m to 4:00 p.m. schedule was not reasonably calculated to provide J.K. with some educational benefit. Only if the Court finds that the School has failed to provide a "basic floor of opportunity" and "access to specialized instruction and related services which are individually designed to provide educational benefits to the handicapped child," can it conclude that the School has denied J.K. a FAPE. *Rowley*, 458 U.S. at 201. The School's refusal to provide services during evening hours does not warrant such a finding. The Plaintiffs have not met their burden and the Court will not overturn the BSEA's determination that J.K. was provided a FAPE. The Defendants are entitled to summary judgment on the Plaintiffs' claim regarding extended hours.

### F. Attorney's Fees

The IDEA authorizes the court to award reasonable attorney's fees as part of the costs "to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B). In their Complaint, the Plaintiffs request attorney's fees. On January 12, 2005, they also submitted a memorandum in support of their request for attorney's fees. On February 4, 2005, the Court stayed briefing on the fee issue until after resolution of the motions for summary judgment. Because the Plaintiffs are not a prevailing party they are not entitled to attorney's fees.

**CONCLUSION**

For the foregoing reasons, the Plaintiffs' Amended Motion for Summary Judgment [DE 18] is DENIED  as to the School Defendants and the School Defendants' Motion for Summary Judgment [DE 47] is GRANTED. Judgment will be entered in favor of the Defendants and against the Plaintiffs.

SO ORDERED on September 27, 2005.

 s/ Theresa L. Springmann                   
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT